IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| TODD ELLIOTT HITT, ) | |
| KIDDAR CAPITAL LLC, and ) | |
| KIDDAR GROUP HOLDINGS, INC., ) | |
| ) | |
| Defendants, ) | CIVIL NO. _____ |
| ) | |
| and ) | |
| ) | |
| KIDDAR HERNDON STATION LLC, ) | |
| KIDDAR HOMEBUILDING FUND I LLC, ) | |
| MELBOURNE RETREAT LLC, ) | |
| KIDDAR MASS AVE LLC, ) | |
| KIDDAR RIDGEVIEW LLC, ) | |
| ESA EMERSON LLC, ) | |
| ESA HIGHWOOD LLC, and ) | |
| KIDDAR AQ LLC a/k/a KIDDAR AQUICORE LLC, ) | |
| ) | |
| Relief Defendants. ) | |
| ) | |

## **COMPLAINT**

Plaintiff Securities and Exchange Commission alleges:

## I.    **INTRODUCTION**

1.     The Commission brings this action to enjoin Defendants Todd Elliott Hitt ("Hitt"), Kiddar Capital LLC ("Kiddar Capital") and Kiddar Group Holdings, Inc. ("Kiddar Group") from violating the antifraud provisions of the federal securities laws.  From no later than mid-2014 through at least September 2018, Defendants engaged in a scheme to solicit investments in various real-estate and other projects, made material misrepresentations and

omissions about the investments, and unlawfully misappropriated and commingled investor funds.

2.      From 2014 to at least September 2018, Hitt, acting individually and through Kiddar Capital and Kiddar Group, raised at least $20 million from at least 29 investors to invest in (i) an office building along the Washington, DC-area Metro line; (ii) construction projects for new homes in Northern Virginia; and (iii) a start-up technology venture. However, he commingled investor monies and proceeds from the projects and transferred funds to and from the Relief Defendants, misappropriated investor funds to support his extravagant lifestyle, and made Ponzi-style payments to prior investors. His machinations left shortfalls and confusion as to the ownership interests in these real-estate development projects. Due to the commingling of assets, the transfer of funds to and from the Relief Defendants, the lack of adequate recordkeeping and documentation, and the ongoing operations of the projects, it is necessary and appropriate for a receiver to be appointed to protect investors, to prevent asset dissipation and loss, to identify and account for investor funds, and to attend to the business of Kiddar Capital, Kiddar Group and the Relief Defendants.

3.      Defendants' largest offering involved a signature property along the new WMATA Silver Line Metro Station in Herndon, Virginia (the "Herndon Station Property"). Beginning in mid-2017, Hitt and Kiddar Capital offered and sold $9.72 million in securities to purchase and operate a commercial office building at the site of the future station on the Metro line to Dulles Airport. In connection with the offer and sale, Hitt and Kiddar Capital falsely stated they would provide a general partnership investment of $6 million and raise an additional $6 million from co-investors. In fact, Hitt and Kiddar Capital put none of their own money into the deal. By February 2018, Defendants had raised sufficient investor funds to close the deal. Despite achieving the

investment goal, however, Hitt solicited an additional $1.2 million from investors in the spring of 2018 after the offering had closed, which he then used partly to pay off past due credit card bills racked up through both general business and lavish personal spending.  Then, in the summer of 2018, Hitt raised an additional $6 million from an offshore investment company (VR) that was sent to Kiddar Capital for further investment in the project.  Hitt and Kiddar Capital misappropriated approximately $1.6 million of that latter investment, transferred some of that amount to Hitt's personal accounts, and used some of it to make payments to prior investors and to pay approximately $222,000 of Kiddar Group's credit card debt, which consisted of both general business and lavish personal expenses.

4.      From 2014 to the present, Defendants raised at least $4.5 million from at least 15 investors for a pooled investment to finance new home construction mostly in northern Virginia. The fund financed 11 residential properties, five of which closed and six of which are in some stage of the development process with at least two new homes ready or nearly ready for listing for sale.  Hitt commingled the fund's assets with monies from other unrelated investments and misappropriated a significant portion of those assets for other business and personal expenditures, including the Herndon Station Property.

5.      In the spring of 2016, Hitt and Kiddar Capital raised at least $2 million from at least five investors for interests in Relief Defendant Kiddar AQ LLC a/k/a Kiddar Aquicore ("Kiddar AQ"), an investment fund managed by Hitt that made a venture capital investment in a start-up business.  However, Defendants invested only $1 million of the funds raised in the business, keeping the remaining $1 million for themselves.  And Hitt misstated his own personal contribution to the fund.

6.      In 2018, Defendants upgraded the website for Kiddar Capital and commenced a public relations effort.  On its website, Kiddar Capital offered private equity and venture capital investments while falsely claiming it managed $1.4 billion in assets and maintained several office locations.  Investor VR visited the website and saw at least the claim that Kiddar Capital was an investment company, when VR sent its $6 million investment to Kiddar Capital for the Herndon Station Property.

7.      As a result of the conduct alleged in this Complaint, Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §77q(a); and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.  In addition, Hitt also violated Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-6(1) and (2).  Unless restrained and enjoined, Defendants are reasonably likely to continue to violate the federal securities laws.

8.      Kiddar Capital, Kiddar Group and the Relief Defendants received some or all of the proceeds of the unlawful scheme under circumstances in which it is not just, equitable or conscionable to be so enriched.

9.      The Commission therefore respectfully requests the Court enter: (i) a permanent injunction restraining and enjoining Defendants from violating the federal securities laws; (ii) a permanent injunction restraining and enjoining Hitt from engaging in certain further conduct; (iii) an order directing Defendants and Relief Defendants to pay disgorgement with prejudgment interest; (iv) an order directing Defendants to pay civil money penalties; (v) an order freezing Hitt's assets until further order of the Court; and (vi) an order appointing a receiver over Defendants and Relief Defendants.

II.      **DEFENDANTS AND RELIEF DEFENDANTS**

A.      **Defendants**

10.      Hitt, age 53, is a resident of Arlington, Virginia, and the founder, president, principal, managing member, and/or general partner of Kiddar Capital, Kiddar Group and the Relief Defendants, and as such is authorized and empowered to act on their behalf.  During the relevant time period, Hitt directed or controlled the business activities and affairs of Kiddar Capital and Kiddar Group, using both companies' offices and financial accounts in connection with the transactions described herein, and both companies functioned as his *alter ego*.  In addition, during the relevant time period, Hitt served as the managing member of Kiddar AQ, a fund that Hitt advised as to the value of securities and as to the advisability of investing in, purchasing, or selling securities – specifically an investment in the securities of Aquicore, Inc.  Defendants and Kiddar AQ have never been registered as investment advisers with the Commission.

11.      Kiddar Capital is a Virginia limited liability company organized by Hitt in 2015 with its principal office located in Falls Church, Virginia.  Hitt is the company's president and managing member.  On June 20, 2018, with a retroactive effective date of January 25, 2018, Hitt amended and restated the company's operating agreement to reflect an investment by an offshore investment group called VR.  During the relevant time period, Hitt directed or controlled the business activities and affairs of Kiddar Capital, using its offices, financial accounts and other resources in connection with the transactions described herein, and the company functioned as his *alter ego*.

12.      Kiddar Group is a Virginia corporation organized by Hitt in 2008 with its principal office located in Falls Church, Virginia.  Hitt is president of the company and its sole

shareholder.  During the relevant time period, Hitt directed or controlled the business activities and affairs of Kiddar Group, using its offices, financial accounts and other resources in connection with the transactions described herein, and the company functioned as his *alter ego*.

**B.  Relief Defendants**

**1.  KHS and Kiddar AQ**

13.  Kiddar Herndon Station LLC ("KHS") is a Virginia limited liability company organized by Hitt in 2017 with its principal office located in Falls Church, Virginia.  Hitt is president of the company, and Herndon Station GP LLC ("HSGP") is the company's manager and sole member.  Hitt is the president and manager of HSGP, and until February 23, 2018, was its sole owner.  Since then, Hitt has held a two-thirds interest in HSGP and all of its voting units.

14.  Kiddar AQ, also known as Kiddar Aquicore LLC, is a Virginia limited liability company organized by Hitt in 2016 with its principal office located in Falls Church, Virginia. Hitt is the company's managing member, and Kiddar Capital is the manager of the company. Kiddar AQ was formed to pool the investments of several investors into a fund for investment in a Series A stock certificate of Aquicore, Inc., a start-up company.

**2.  The Home Building Fund Entities**

15.  Kiddar Homebuilding Fund I LLC ("Kiddar HBF"), also known as Kiddar Capital Homebuilding Fund 1 LLC, is a Virginia limited liability company organized by Hitt in 2015 with its principal office located in Falls Church, Virginia.  Hitt is the company's president and manager.  During the relevant time period, the company owned and offered Home Building Fund investments in the following real properties: XX33 John Marshall Drive, Arlington, VA 22207; XX07 North Kensington, Arlington, VA 22207; XX25 N. Kensington, Arlington, VA 22207; and XX25 Ormond Court, McLean, VA 22101.

16.     Melbourne Retreat LLC ("Melbourne") is a Virginia limited liability company organized by Hitt in 2016 with its principal office located in Falls Church, Virginia. Hitt is the company's managing member.  During the relevant time period, the company owned and offered an additional Home Building Fund investment in the real property located at XX89 Melbourne Avenue, Deale, MD 20751.

17.     Kiddar Mass Ave LLC ("Mass Ave") is a Virginia limited liability company organized by Hitt in 2016 with its principal office located in Falls Church, Virginia.  Hitt is the company's managing member.  During the relevant time period, the company owned and offered an additional Home Building Fund investment in the real property located at XX58 Massachusetts Avenue, McLean, VA 22101.

18.     Kiddar Ridgeview LLC ("Ridgeview") is a Virginia limited liability company organized by Hitt in 2017 with its principal office located in Falls Church, Virginia. Hitt is the company's managing member.  During the relevant time period, the company owned and offered additional Home Building Fund investments in the real properties located at XX01 Chain Bridge Forrest Court, McLean, VA 22101 and XX08 North Ridgeview Road, Arlington, VA 22207.

19.     ESA Emerson LLC ("Emerson") is a Virginia limited liability company organized by Hitt in 2017 with its principal office located in Falls Church, Virginia.  Hitt is the company's sole member.  During the relevant time period, the company owned and offered an additional Home Building Fund investment in the real property located at XX14 North Emerson, Arlington, VA 22207.

20.     ESA Highwood LLC ("Highwood") is a Virginia limited liability company organized by Hitt in 2017 with its principal office located in Falls Church, Virginia.  Hitt is the company's sole member.  During the relevant time period, the company owned and offered an

additional Home Building Fund investment in the real property located at XX30 Highwood Drive, McLean, VA 22207.

## III.    JURISDICTION AND VENUE

21.    The real estate offerings and investments that Defendants offered and sold are "securities" under Section 2(1) of the Securities Act, 15 U.S.C. § 77b(1), Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10), and Section 202(a)(18) of the Advisers Act, 15 U.S.C. § 80b-2(a)(18).

22.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331; Sections 20(b), 20(d) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d) and 77v(a); Sections 21(d) and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa(a); and Sections 209(d), 209(e) and 214(a) of the Advisers Act, 15 U.S.C. §§ 80b-9(d), 80b-9(e) and 80b-14(a).

23.    The Court has personal jurisdiction over Defendants and venue is proper in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), Section 214(a) of the Advisers Act, 15 U.S.C. § 80b-14(a), and 28 U.S.C. § 1391, because, among other things, Defendants reside in this District; they participated in the offer or sale of securities in this District;  and some or all of the acts and transactions in which Defendants engaged and that constitute violations of the federal securities laws occurred in this District.

24.    In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, the mails, and/or the facilities of a national securities exchange.

IV.     **FACTUAL BACKGROUND**

    A.     **Todd Hitt's Real Estate Development Business**

    25.     After working as a licensed real estate agent, Hitt began to develop and sponsor real-estate development projects in northern Virginia.  During the relevant time period, however, instead of committing his own capital outright, on a number of occasions Hitt sought to have friends, including Investors A, B, and C, provide the capital, while leaving those investors with the impression Hitt had invested more of his own capital than he actually had.

    26.     When a developer or sponsor of a real estate investment commits his or her own capital as an investor while also serving as the general partner or managing member of the project, that developer is referred to as having "skin in the game."   Other investors are more likely to invest in projects in which the developer has "skin in the game" because the investors believe the developer will take the building and managing of the project more seriously as the developer would lose some of his or her own money if the project failed.

    B.     **Defendants' Misuse of and Misappropriation of Funds from the Home Building Fund**

    27.     Beginning in 2014, Hitt began a fund to raise money from investors to provide liquidity to residential homebuilders in northern Virginia.  Hitt operated the fund through several limited liability companies, including the Relief Defendants identified in Section II.B.2 above (collectively, the "Home Building Fund").

    28.     Defendants pooled monies they raised from investors and used those monies to extend loans to developers in exchange for a second mortgage on each property being developed, subordinate only to the original mortgage lender.  The loans carried an interest rate of 12%, and, upon the sale of the improved property, an additional fee of 3-5% of the gross sales price of the

property, both of which were payable at the time of closing and constituted the Home Building

Fund's return on investment ("ROI").

29.     During the relevant time period, Defendants solicited investments in the form of

investment contracts from investors primarily consisting of Hitt's friends and associates, telling

prospective investors that Hitt intended to invest the fund's capital in secured loans to real estate

developers.  Investors were told they would receive a *pro rata* share of the fund's ROI once the

property was sold.  Defendants solicited the investors both in person and by electronic

communications (emails and text messages).

30.     With the exception of one investor who served as a realtor for some of the

properties, investors had no active role in the development of the properties and relied entirely

on, and expected profits solely from, the efforts of Defendants or the developer to manage their

investments.  One investor explained that he wrote the check and relied entirely on Hitt.  Another

investor stated the investors were passive and that Hitt managed the investments.  From 2014 to

the present, Defendants solicited at least 15 investors who invested a combined total of at least

$4.5 million in the Home Building Fund.

31.     The largest investor in the fund was Investor A.  At the outset, Hitt did not tell

Investor A that there were other investors.  Instead, Hitt told Investor A that Hitt would

personally contribute fifty-percent of the equity required to develop the properties.  It was

important to Investor A that Hitt, too, was investing in the properties because it meant Hitt had

"skin in the game."  With that understanding, Investor A agreed to contribute the remaining fifty-

percent of the equity.  This representation was different, however, from the representations Hitt

made to other investors in the fund.  At least two other such investors understood they were

investing in a fund with other investors.

32.     The approximate investments in the Home Building Fund discovered to date are described in the following chart:

| | |
|---|---|
| Investor A | $1,746,534 |
| Other Investors | $2,825,000 |
| Total Investment in the Home Building Fund by Investors other than Hitt | $4,571,534 |

33.     Defendants misappropriated a significant amount of the $4.5 million of investor funds, transferring large amounts to other Kiddar-related entities to pay for operating expenses, or to Hitt's personal bank accounts.  For example:

From January 19 to 23, 2017, Hitt received $325,000 from three investors in the Home Building Fund.  By January 24, 2018, Hitt transferred $213,000 of that amount to other Hitt-related bank accounts, including $43,000 to two of Hitt's personal accounts.

On February 15, 2017, Hitt received $150,000 from another Home Building Fund investor into an account that had other monies.  On the same day, Hitt transferred $151,000: $91,000 to Hitt's personal accounts; and $60,000 to a Kiddar Group account.

This conduct appears to have continued through at least June 2018.

34.     Consequently, to make up for the Home Building Fund's monies that were misappropriated, Hitt sometimes used investments from unrelated funds in order to provide the loans to the builders.  For example, to pay the title company for the development of the fund's property located at XX25 Ormond Ct. (*see chart below*), Hitt transferred $314,894.01 from an investor's separate investment in Kiddar AQ.

35.     Defendants did not disclose to investors that they would commingle the proceeds of their investments in this manner.   Instead, Defendants' use of the proceeds constituted a misappropriation of investor funds, and was contrary to the promises Defendants made to investors.

36.     From 2014 to the present, the Home Building Fund financed the following real estate transactions at the following stages of development:

| Entity | Property | Closing Date or Stage of Development |
|---|---|---|
| Kiddar Metz LLC | XX06 28th St., Arlington, VA 22207 | December 18, 2015 |
| Kiddar HBF | XX33 John Marshall Dr., Arlington, VA 22207 | October 14, 2016 |
| Kiddar HBF | XX07 N. Kensington, Arlington, VA 22207 | April 4, 2017 |
| Kiddar HBF | XX25 N. Kensington, Arlington, VA 22207 | July 28, 2017 |
| Kiddar HBF | XX25 Ormond Ct., McLean VA 22101 | February 13, 2018 |
| Melbourne | XX89 Melbourne Ave., Deale, MD 20751 | Vacant lot |
| Mass Ave | XX58 Massachusetts Ave, McLean, VA 22101 | Vacant Lot |
| Ridgeview | XX01 Chain Bridge Forrest Ct., McLean, VA 22101 | Completed development |
| Ridgeview | XX08 N. Ridgeview Rd., Arlington, VA 22207 | Under Construction |
| Emerson | XX14 N. Emerson, Arlington, VA 22207 | Under Construction |
| Highwood | XX30 Highwood Dr., McLean, VA 22207 | Vacant Lot |

37.     In many cases, Defendants misappropriated the Home Building Fund's ROI – that is, the proceeds paid back from the sale of a new home financed by the fund – and did not pay back the fund's investors.  For example:

The Home Building Fund's ROI following the sale of XX25 N. Kensington was $519,923.91; however, from August 1, 2017 through August 18, 2017, Hitt transferred all of those funds from Kiddar HBF's bank accounts to two unrelated bank accounts:  Kiddar Group's account and Hitt's personal account.  Hitt used the money – with the exception of $300,000 that went to a title company presumably for a Home Building Fund development – to pay for expenses unrelated to the fund, including personal expenses.  Although Investor A's share of the ROI was $400,000 for the sale, Hitt initially failed to pay Investor A.  Hitt later agreed to make a cash payment of $400,000 to Investor A, as well as to execute an equity swap to the investor for an interest in the Herndon Station Property, another investment unrelated to the Home Building Fund, to compensate him for an additional debt.

The Home Building Fund's ROI following the sale of XX25 Ormond Ct. was $509,522.29; however, all of the proceeds were sent directly to a Kiddar Group bank account and then transferred to KHS' bank accounts, where at least $500,000 of the proceeds (if not all of the proceeds) was applied to a $6,140,000 payment to Commonwealth Land Title Insurance for the Herndon Station Property closing.  Although Investor A's share of the ROI was $312,000, Hitt did not pay Investor A his share of the equity until July 2, 2018, after Hitt had received an investment from another investor for an unrelated fund – the VR investment in Kiddar Capital – that first went through Hitt's personal accounts.

On or about June 18, 2018, Hitt agreed to transfer another Home Building Fund investor's investment to a different real estate investment project "in order to provide [the investor] some predictability as to the time of exit" from the fund.

38.     Defendants did not disclose to investors that they would commingle the proceeds of their investments in this manner.  Instead, Defendants' use of the proceeds constituted a misappropriation of investor funds, and was contrary to the promises Defendants made to investors.

39.     Kiddar HBF, Melbourne, Mass Ave, Ridgeview, Emerson and Highwood owned and offered the respective Home Building Fund investments in the real properties as identified in the chart above.   Hitt's practice of commingling and misappropriating both the investments and the remittances acted as a fraud or deceit on the investors in each subsequent real-estate offering, such that Kiddar HBF, Melbourne, Mass Ave, Ridgeview, Emerson and Highwood hold the proceeds of the fraud.

### C.     Defendants' Misappropriation from Kiddar AQ

40.     During the relevant time period, Defendants solicited investors to invest in certain "tech" related investment opportunities, including Aquicore, Inc. ("Aquicore"), an independent start-up company located in Washington, DC, that provides Internet of Things (IoT) solutions for commercial real-estate operations. Defendants solicited the investors both in person and by electronic communications (emails and text messages).

41.     Defendants offered to pool investors' money into a purported venture capital fund to make the investments. The investments were in the form of limited liability company memberships, and investors relied entirely on, and expected profits solely from, the efforts of Defendants to manage their investments.

42.     On January 20, 2016, Hitt informed an investor by email that Defendants would be moving forward with other investors to infuse $4 million into Aquicore.  Hitt added that he would direct the creation of a "Kiddar-Aquicore Fund LLC" to manage the placement of the funds.

43.     On February 1, 2016, Hitt, on behalf of Kiddar Capital, signed a term sheet with Aquicore that provided that Kiddar Capital would contribute $1 million, with other investors contributing a second $1 million investment, at initial closing.

44.     On February 25, 2016, Hitt created Kiddar AQ as a vehicle to pool investor monies and make investments in Aquicore.  As the managing member of Kiddar AQ, Hitt and the Defendants operated the company as a fund to receive investments – specifically investments in the securities of Aquicore.  Defendants advised the company as to the value of the Aquicore investment and as to the advisability of investing in, purchasing, or selling that security.

45.     Beginning in February and continuing through April 2016, Defendants solicited investments from investors telling them that they intended to invest the monies in Aquicore. Defendants solicited the investors both in person and by electronic communications (emails and text messages).

46.     In total, Hitt raised at least $2 million from at least five investors.  One of the investors, Investor B, invested $1 million into Kiddar AQ.

47.     Hitt misappropriated a significant portion of the funds that investors sent to Kiddar AQ for investments in Aquicore.  For example:

    ▣ On April 15, 2016, $80,000 of Investor B's investment was transferred to a Kiddar Group account to pay for Kiddar-related operating expenses.

⊞ On April 18, 2016, $314,894.01 of Investor B's investment was used to pay for the Home Building Fund investment in XX25 Ormond Court, as discussed above.

48.    Hitt did not disclose to investors that he would commingle their investments in this manner.  Instead, Defendants' use of the proceeds constituted a misappropriation of investor funds, and was contrary to the promises Defendants made to investors.

49.    Hitt misled the investors about the nature of his personal investment in Kiddar AQ. The Operating Agreement ("OA") for Kiddar AQ provided that, in exchange for their investment, investors would receive an ownership – otherwise known as a membership – interest in Kiddar AQ.  Exhibit A to the OA defined Hitt's initial capital contribution as $1 million and his ownership interest in Kiddar AQ as 20%.  At least two investors received the OA for Kiddar AQ.

50.    On April 14, 2016, Hitt emailed one investor the Kiddar AQ, OA and wire instructions for a $200,000 investment.  Hitt told the investor, "If you want to do more, I'm happy to shed a portion of my $1.8m but don't want to go lower than $1.5m, which would put you anywhere between $200k and $500k."

51.    On February 17, 2017, Investor B emailed a Kiddar employee a series of tax documents related to his investment in Kiddar AQ.  Included in those documents was the OA.

52.    Hitt did not make any personal investment into Kiddar AQ.

53.    On April 22, 2016, Kiddar AQ purchased 1,222,347 shares of Series A Preferred Stock from Aquicore for $1 million. However, Kiddar AQ did not purchase any additional shares.  The remaining $1 million in investor funds has not been paid back to investors.  Instead, Defendants and some or all of the Relief Defendants kept the additional $1 million.

**D.     The Herndon Station Property Offering Fraud**

54.     In 2017, Hitt began to arrange the purchase of the Herndon Station Property.  The project included a 5-story commercial building located adjacent to the planned WMATA Silver Line Herndon Metrorail Station in Herndon, Virginia.

55.     The contract purchase price for the property was $33 million, and the total project cost for the acquisition, necessary reserves, and fees involved in the transactions was approximately $36 million, as projected in the August 2017 Offering Memorandum ("OM"). KHS was the purchaser and HSGP managed KHS.  KHS planned to acquire the property by borrowing $24 million from a bank, through a $6 million contribution by the General Partner – HSGP – and by raising an additional $6 million in co-investment equity in a private offering to Limited Partners.

56.     The terms of the KHS investment were described in the OM. Hitt provided the content of the OM and approved its being provided to prospective investors.  The OM identified Hitt as principal of KHS.  The OM stated that "[t]his memorandum is being provided to select accredited investors in anticipation of a private offering exempt from the registration requirements of the Securities Act of 1933."

57.     Among other things, the OM represented:  "Debt will constitute $24,750,000 and the required equity will be approximately $12,000,000.  *Kiddar Capital is planning to contribute half of the equity required for the project, allowing selected partners to come in for the second half.*"  (Italics added.)

58.     It was important to investors that Hitt purportedly would infuse $6 million of Kiddar Capital's money at risk in the transaction through HSGP, because it indicated to them that Hitt had "skin in the game."  Subscribers to the KHS offering began depositing their

investment monies on or about August 9, 2017.  Between then and May 18, 2018, 29 investors contributed at least $10.92 million in equity to KHS.  Investors provided their investments by a combination of wire-transfers and checks.  Most of the investments were in the form of Class A Units of Membership Interests in KHS, and investors relied entirely on, and expected profits solely from, the efforts of Defendants to manage their investments. As described below, $2 million was a General Partner contribution made by Investor C (not Hitt).

59.     The representation about Kiddar Capital's $6 million contribution was untrue because Hitt did not intend for Kiddar Capital to contribute any money towards the purchase of the Herndon Property.

60.     Moreover, until mid-December 2017, none of the $6 million General Partner contribution had been funded.  At that point, Hitt solicited an additional $2 million from Investor C – who had already invested in KHS as a limited partner – as a General Partner contribution.  On or about December 18, 2017, Investor C contributed the $2 million.  When Investor C made the contribution, Hitt represented that he had contributed $4 million as a General Partner and that the investor's additional $2 million would enable KHS to fulfill its $6 million General Partner contribution.  Hitt's representation was false because neither Hitt nor Kiddar Capital contributed any of their own money to KHS.

61.     After they received investor funds into KHS' bank accounts, Defendants diverted some of the funds for purposes unrelated to the Herndon Station Property.  As a result of this diversion, Hitt was short on funds to close on the purchase of the property.  Within weeks of the closing, Hitt transferred money back into the KHS account.

62.     On February 23, 2018, KHS closed on the purchase of the Herndon Station Property.  To finance the purchase, KHS obtained the $24 million bank loan.

63.     As a result of credits provided by the seller, however, KHS needed only about $8.86 million in equity to complete the purchase, leaving excess investor funds.  By on or about March 8, 2018, investors had contributed approximately $9.72 million to KHS for the project.  Defendants misappropriated at least the remaining investor contributions without disclosing that fact to the investors.  For example, they diverted some of the funds to unrelated business projects and others to pay credit card bills, including payments to four of Hitt's personal credit cards.  Defendants thus overcapitalized the KHS project and then skimmed the excess funds.

64.     Of the equity raised from investors, $500,000 of it resulted from an elaborate Ponzi-like fraud conducted by Hitt.  Hitt owed Investor A $900,000 as a result of the sale of a new home Investor A had helped to finance through the Home Building Fund, and as a result of a separate home loan Investor A had provided.  Hitt and Investor A agreed that Hitt would pay Investor A $400,000 cash, and that Investor A would accept the rest of the funds he was owed by accepting a $500,000 equity investment in KHS.

65.     In February 2018, two related events occurred.  The first event:  As part of the Home Building Fund, Hitt sold a new home (Ormond Ct.) in which Investor A had invested approximately $509,000.  On February 13, 2018, the proceeds were wired to a bank account that Hitt controlled.  Hitt owed Investor A $312,000 from the sale of that home, but did not inform Investor A that Hitt had sold the home.  The second event:  Hitt needed additional funds to close the purchase of the Herndon Station Property.  On February 23, 2018, Hitt wired more than $509,000 in proceeds from the sale of the home to KHS' bank account. The funds were immediately wired-transferred, with KHS investor funds, to the title company for the closing of the Herndon Station Property purchase, which occurred that same day.

66.     Months later, Investor A discovered that the home (Ormond Ct.) had been sold in February 2018, and asked Hitt for the money he was owed ($312,000).  Hitt had obtained that money from a new investment provided by another investor (VR) (described below) and, in late June or early July 2018, provided it to Investor A without informing Investor A that he had fraudulently obtained the funds.

67.     On February 23, 2018, when KHS closed on the purchase of the Herndon Station Property, Hitt and Investor C executed an Amended and Restated Limited Liability Company Operating Agreement for Herndon Station GP LLC ("Amended Operating Agreement").  The Amended Operating Agreement included a "Membership Register" reflecting "Units and Capital Contributions."  According to the Membership Register, Hitt had made a capital contribution of $4 million, and Investor C had contributed $2 million.  The Membership Register was false because Hitt made no capital contribution toward the Herndon Station Property.

68.     Defendants did not disclose to investors that they would commingle the proceeds of their investments in the manner described above, and the OM also did not disclose that funds would be used in that way.  Instead, Defendants' use of the proceeds constituted a misappropriation of investor funds, and was contrary to the promises Defendants made to investors.

**E.     The WF Investment**

69.     After KHS's purchase of the Herndon Station Property closed, Defendants sought an additional post-closing "investment" in KHS.  In March or April 2018, they solicited an additional investment from a real estate investment company (WF).  The investment was in the form of Class A Units of Membership Interests in KHS, and WF relied entirely on, and expected profits solely from, the efforts of Defendants to manage its investment.

70.     Around that time, in February and March 2018, Hitt had incurred, among others, the following charges on a credit card held by Kiddar Group:

| | |
|---|---|
| "NBA – Washington Wizards" | $7,791 |
| "USA Livery Inc." | $7,065 |
| "Canyon Ranch Resort" | $26,910 |
| "Bulgari" | $59,220 |
| "Cartier" | $5,241 |
| "Denise Betesh" | $6,840 |
| "Chantilly Air" | $52,997 |
| "Ultimate Jet Vacations" | $33,110 |

71.     The balance on the March 2018 credit card statement was $357,253 and there was a past due amount that was due immediately.  In April 2018, the credit card company imposed a $10,681 late fee on the account.

72.     On March 31, 2018, a finder working on behalf of Defendants emailed WF a new KHS LLC Offering Memo ("New OM") that Hitt had approved dated March 18, 2018.  On or about April 10, 2018, Hitt met with a representative of WF.  The New OM was almost identical to the original OM.  It stated that KHS was "seeking to raise $6,000,000 in co-investment equity alongside a general partner contribution of $6,000,000."  It also repeated the false statement that "Kiddar Capital is planning to contribute half of the equity required for this project."  The New OM included the following new sentence: "KHS completed the acquisition of the property in February of 2018 and is **seeking an additional $1,200,000** to complete the 50% co-investment strategy."  (Emphasis in original.)

73.     Representatives from WF contemporaneously reviewed the New OM and understood from it and from Hitt that Kiddar Capital had contributed $6 million to the Herndon Station Property project as its General Partner.  It was significant to WF that Kiddar Capital had contributed $6 million to the project because it indicated to them that Kiddar Capital had placed its own money at risk and, therefore, had "skin in the game."  WF also believed, based on Hitt's

representations, that Hitt himself had, in addition to contributing $6 million to the project, paid an additional $1.2 million because one of the Limited Partner investors had failed to make its contribution.  Hitt represented to WF that he had contributed a total of $7.2 million to the deal and that, by paying $1.2 million, WF would be buying out Hitt's $1.2 million Limited Partner investment. A May 16, 2018 side letter agreement between KHS (signed by Hitt) and WF expressly stated: "Kiddar Capital LLC, as [WF's] nominee, previously funded $1,200,000 . . . on [WF's] behalf in respect of [WF's] subscription for 1,200 Class A Units."  Unbeknownst to WF, this statement was false because Hitt had not contributed $1.2 million, or any money, to the project.

74.     WF's representatives signed both the side letter agreement dated May 16, 2018, and a subscription agreement for the investment in KHS.

75.     On May 18, 2018, WF wire transferred $1.2 million to a Kiddar Capital bank account.  This brought the total amount of outside investor contributions in KHS to $10.92 million – $2.06 million more than was required to purchase the Herndon Station Property.  As with other excess funds from Hitt's overcapitalization of KHS, Defendants misappropriated the $1.2 million investment by WF.  For example, on May 18, 2018, as soon as Hitt received the $1.2 million from WF, he wired $600,000 of it to a Kiddar Group bank account in which he commingled personal and business-related funds.  From May 18 to 29, 2018, after receiving WF's $1.2 million, Hitt transferred a net total of $400,000 to two of his personal bank accounts.  On May 31, 2018, he also transferred approximately $190,000 to a bank account ostensibly associated with a different real estate investment.  Within days of transferring the $600,000 to the Kiddar Group account, approximately $230,000 of it was used to pay monies owed on the previously-mentioned Kiddar Group's overdue credit card.

76.     Defendants did not disclose to investors that they would commingle the proceeds of their investments in the manner described above, and the New OM also did not disclose that funds would be used in that way. Instead, Defendants' use of the proceeds constituted a misappropriation of investor funds, and was contrary to the promises Defendants made to investors.

**F.     Defendants Offered Investments in 2018 Based on False Claims**

77.     By at least 2018, through press releases, public statements and an internet website at www.kiddar.com, Defendants offered real estate, private equity, and venture capital investments while making a series of false claims.

78.     On February 3, 2017, Kiddar Capital announced that it was seeking to raise $25 million of outside investment capital to invest in a new fund.  The press release claimed that Kiddar Capital had $600 million in assets under management and added that: "We contribute 10% of the total fund from our own capital so we have skin in the game and are right alongside our limited partners."

79.     On February 16, 2017, Defendants repeated these claims when they announced in a release over PRNewswire the launch of "a second public fund" that would raise another $25 million for a ten-year fund with targeted returns of 20% over the life of the fund.

80.     On or about December 25, 2017, Kiddar Capital published a "Year in Review" that appeared on its website.  Among other things, the report claimed that 2017 was a "big year for us at Kiddar Capital."  The report then mentioned $500 million in real estate projects initiated and $75 million of investment funds launched.

81.     On February 12, 2018, a press release announced, among other things, that Kiddar Capital hired additional staff, "to help manage its more than $1 billion in assets and investments."

82.     By June 2018, Kiddar Capital's website described the firm as follows:

> "Kiddar Capital is a global alternative asset management firm based in the Washington, DC area with offices in Houston, Palm Springs, and London, England."

In fact, Kiddar did not have offices outside of the Washington, DC-area.

83.     The Kiddar Capital website also dramatically overstated its assets under management.  By June 2018, the website claimed:

> "Launched by American businessman Todd Hitt, the firm manages $1.4 billion across established and emerging asset classes including private equity, real estate, infrastructure, venture, credit, energy, and hospitality."

In fact, Kiddar did not have assets under management that were anywhere close to $1 billion.  In the spring of 2018, certain employees at Kiddar Capital who had access to the general ledger tried to verify the claims of more than $1 billion in assets under management by reviewing internal company documents, but were only able to come up with a possible valuation of approximately $27 million in assets.  As an example, an internal portfolio summary as of March 26, 2018 of Kiddar Capital's Venture Portfolio listed total investments of approximately $1.6 million.

**G.      Defendants Misappropriate Part of VR's $6 million Investment in Kiddar Capital**

84.     On June 20, 2018, VR, an offshore investment company, entered into a restated Operating Agreement for Kiddar Capital.  This restated agreement, though executed in June, purported to be effective as of January, 2018.  The agreement identified VR as an investor and a Class A member of Kiddar Capital.

85.     From on or about June 26, 2018 through on or about August 3, 2018, VR invested approximately $6 million in Kiddar Capital.  VR entrusted this $6 million as an investment contract expecting that Kiddar Capital and Hitt would invest the money in the Herndon Station Property.

86.     When VR sent this investment to Kiddar Capital, VR's principal saw Kiddar's website and understood that Kiddar was an investment company.  (As described above, in June 2018, Kiddar Capital described itself as a "global alternative asset management firm.")

87.     Contrary to VR's expressed desires and understanding, however, Defendants used some of VR's investment for certain other uses that were not related to KHS. For example, approximately $1.4 million was transferred to Hitt's personal bank accounts.  From there some of that money was used to pay Investor A back the $312,000 he was owed from the sale of the Ormond Ct. Home Building Fund property, as described above. In addition, approximately $125,000 was transferred to an unrelated real estate venture. Also, Hitt used some of VR's investment in July 2018 to pay to pay a Kiddar Group American Express card balance of $222,258.23. That balance was comprised, in part, of the following business and personal charges:

| 5/24/18 | "NHL-Washington Capitals" | $3,240 |
| 5/24/18 | "NBA-Washington Wizards" | $8,250 |
| 5/24/18 | "NBA-Washington Wizards: | $59,500 |
| 5/28/18 | "Mercedes-Benz" | $10,000 |
| 6/02/18 | "Four Seasons Bourbon" | $2,897.40 |
| 6/7/18 | "Four Seasons Baltimore" | $3,083.63 |
| 6/10/18 | "The Inn at Perry Cabin" | $11,462.24 |
| 6/11/18 | "NHL-Washington Capitals" | $2,704 |
| 6/15/18 | "NBA-Washington Wizards" | $25,500 |
| 6/15/18 | "NHL-Washington Capitals" | $4,166 |
| 6/15/18 | "BB*PHILLIPS COLLECTION Blackbaud, Inc." | $35,370 |

88.     Defendants did not disclose to VR that they would commingle the proceeds of their investments in this manner. Instead, Defendants' use of this $1.6 million of VR's investment constituted a misappropriation of investor funds, and was contrary to the promises Defendants made to VR.

### H.     Defendants' Commingling of Assets and the Use of New Investor Funds to Pay Old Investors Have Continued to the Present

89.     It is necessary and appropriate for a receiver to be appointed to protect investors, to identify and account for investor funds, and to attend to the business of Kiddar Capital, Kiddar Group and the Relief Defendants.   In addition, a receivership is warranted because of Defendants' recent efforts to continue to arrange for Ponzi-style payments to keep their scheme afloat.

90.     For example, in August and September 2018, Hitt began negotiations to have WF replace him as the General Partner while leaving him with a limited partner interest.  In addition, on August 16, 2018, Hitt signed an agreement titled "Swap Agreement" to swap an investor's interest in KHS for an interest that Hitt purported to have in another real estate project alongside that investor and another investor.

91.     On September 21, 2018, that investor filed an action in state court to enforce the August 16 swap agreement.

92.     Moreover, the status and operation of several important real-estate properties in northern Virginia have been left in limbo and confusion.  For example, on or about September 26, 2018, a previously scheduled real-estate closing was canceled for one of the Home Building Fund properties, and another home will be available for closing next month.  Furthermore, the lease of the principal tenant at the Herndon Station Property is coming up for renewal in the near future.

93.     Defendants have engaged in fraud and misappropriation of assets and are thus unqualified to manage the continued business and affairs of Kiddar Capital, Kiddar Group and the Relief Defendants.   A receiver should be appointed to take control of the assets and operations of Kiddar Capital, Kiddar Group and the Relief Defendants to prevent further damage, dissipation and loss to investors.

## COUNT I

### Fraud in Violation of Section 17(a)(1) of the Securities Act

**(Against All Defendants)**

94.     The Commission repeats and realleges Paragraphs 1 through 93 of its Complaint.

95.     Defendants, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly knowingly or recklessly employed any device, scheme or artifice to defraud.

96.     By reason of the foregoing, Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT II

### Fraud in Violation of Section 17(a)(2) of the Securities Act

**(Against All Defendants)**

97.     The Commission repeats and realleges Paragraphs 1 through 93 of its Complaint.

98.     Defendants, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly knowingly, recklessly or negligently obtained money or property by means

of untrue statements of material facts or omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

99.     By reason of the foregoing, Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## COUNT III

### Fraud in Violation of Section 17(a)(3) of the Securities Act

**(Against All Defendants)**

100.     The Commission repeats and realleges Paragraphs 1 through 93 of its Complaint.

101.     Defendants, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly knowingly, recklessly or negligently engaged in transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon the purchasers and prospective purchasers of such securities.

102.     By reason of the foregoing, Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

## COUNT IV

### Fraud in Violation of Section 10(b) and Rule 10b-5(a) of the Exchange Act

**(Against All Defendants)**

103.     The Commission repeats and realleges Paragraphs 1 through 93 of its Complaint.

104.     Defendants directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly employed any device, scheme or artifice to defraud in connection with the purchase or sale of any security.

105.     By reason of the foregoing, Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a).

## COUNT V

### Fraud in Violation of Section 10(b) and Rule 10b-5(b) of the Exchange Act

### (Against All Defendants)

106.     The Commission repeats and realleges Paragraphs 1 through 93 of its Complaint.

107.     Defendants directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading in connection with the purchase or sale of any security.

108.     By reason of the foregoing, Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

## COUNT VI

### Fraud in Violation of Section 10(b) and Rule 10b-5(c) of the Exchange Act

### (Against All Defendants)

109.     The Commission repeats and realleges Paragraphs 1 through 93 of its Complaint.

110.    Defendants directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon any person in connection with the purchase or sale of any security.

111.    By reason of the foregoing, Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(c).

## COUNT VII

### Investment Adviser Fraud in Violation of Section 206(1) of the Advisers Act

### (Against Hitt)

112.    The Commission repeats and realleges Paragraphs 1 through 93 of its Complaint.

113.    Hitt acted as an investment adviser to Kiddar AQ within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11).  For compensation, he engaged in the business of advising the company and its investors as to the value of securities and as to the advisability of investing in, purchasing, or selling securities.

114.    By engaging in the conduct described in this Complaint, Hitt, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, knowingly or recklessly employed any device, scheme, or artifice to defraud any client or prospective client.

115.    By reason of the foregoing, Hitt violated, and, unless enjoined, is reasonably likely to continue to violate, Section 206(1) of the Advisers Act, 15 U.S.C. § 80b-6(1).

## COUNT VIII

### Investment Adviser Fraud in Violation of Section 206(2) of the Advisers Act

### (Against Hitt)

116.    The Commission repeats and realleges Paragraphs 1 through 93 of its Complaint.

117.    Hitt acted as an investment adviser to Kiddar AQ within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11).  For compensation, he engaged in the business of advising the company and its investors as to the value of securities and as to the advisability of investing in, purchasing, or selling securities.

118.    By engaging in the conduct described in this Complaint, Hitt, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, knowingly, recklessly or negligently engaged in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

119.    By reason of the foregoing, Hitt violated, and, unless enjoined, is reasonably likely to continue to violate, Section 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(2).

### RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find Defendants committed the violations charged, and enter Judgments:

### I.

### Permanent Injunctions

Permanently restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating the federal securities laws alleged in this Complaint; and further permanently restraining and enjoining Hitt, his officers, agents, servants, employees, attorneys,

and all persons in active concert or participation with them, and each of them, from directly or indirectly, including, but not limited to, through any entity owned or controlled by Hitt, participating in the issuance, purchase, offer, or sale of Units of Membership Interests in Limited Liability Companies, General Partnerships, or Limited Partnerships, including Units offered in real estate development companies, provided, however, that such injunction shall not prevent Hitt from purchasing or selling these or any other securities for his own personal account.

## II.

### Disgorgement

Ordering Defendants and Relief Defendants to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

## III.

### Penalties

Ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), and as to Hitt, further pursuant to Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e).

## IV.

### Asset Freeze

Freezing Hitt's assets until further Order of the Court and directing that all financial or depository institutions comply with the Court's directive.

## V.

### Appointment of a Receiver

Appointing a receiver over Kiddar Capital, Kiddar Group and Relief Defendants.

## VI.

## **Further Relief**

Granting such other and further relief as the Court determines to be necessary and appropriate.

## VII.

## **Retention of Jurisdiction**

Further, the Commission respectfully requests the Court retain jurisdiction over this action and over Defendants and Relief Defendants in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

DATED:  October 5, 2018                     Respectfully submitted,

                                                    SECURITIES AND EXCHANGE COMMISSION

                                                    By:     /s/ Nicholas C. Margida
                                                            Nicholas C. Margida (VSB No. 73176)
                                                            Sarah Hall (VSB No. 71084)

                                                            Securities and Exchange Commission
                                                            100 F Street NE
                                                            Washington, DC 20549
                                                            Telephone: (202) 551-8504 (Margida)
                                                            Fax: (202) 772-9282
                                                            Email: margidan@sec.gov
                                                                     halls@sec.gov

                                                            Attorneys for Plaintiff

Of Counsel:

Patrick R. Costello (application for admission *pro hac vice* filed concurrently)
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549

- 33 -